**SO ORDERED.**

**SIGNED this 07 day of June, 2010.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| A-1 PLANK & SCAFFOLD MFG., INC. | ) | Case No. 10-10379 |
| | ) | Chapter 11 |
| | ) | |
| Debtor-in-Possession | ) | |
| _____ ) | | Jointly Administered |
| IN RE: | ) | |
| | ) | |
| ALLENBAUGH FAMILY LIMITED | ) | Case No. 10-10378 |
| PARTNERSHIP | ) | Chapter 11 |
| | ) | |
| Debtor-in-Possession | ) | |
| _____ ) | | |

### ORDER ON SUNFLOWER BANK'S OBJECTION TO REALTOR'S
### COMMISSION ON BANK'S CREDIT BID ON SALE NO. 6

Debtors Allenbaugh Family Limited Partnership ("AFP") and A-1 Plank & Scaffold Mfg.,

-1-

Inc. ("A-1") filed their Motion and Notice of Sale No. 6 on May 4, 2010.[1] In the Motion, debtors proposed to sell *inter alia* certain real property known as 500 Commerce Parkway, Hays, Kansas, to Sizewise Rentals, LLC, for $800,000 cash.[2] Sunflower Bank ("Bank") credit bid $1.75 million on 500 Commerce, but objected to the payment of any real estate commission to the debtor's realtor, J.P. Weigand & Co. ("Weigand"), on any portion of the credit bid.[3] At a hearing conducted on May 26, 2010, the credit bid sale of 500 Commerce was approved and both the Bank and the debtor introduced evidence concerning the broker's fee. Specifically, Weigand seeks a 6% commission on the $800,000 cash bid. Having considered the record and the applicable law, the Court concludes that the broker's fee should be allowed on the cash bid portion of the sale proceeds and be treated as a surcharge under 11 U.S.C. § 506(c).

Facts

Allenbaugh Family Limited Partnership ("AFP"), the owner of 500 Commerce, filed its case on February 21, 2010. It, and its companion case, A-1 Plank & Scaffolding, L.L.C., ("A-1") involve the interlocking business activities of the Allenbaugh family.[4] An order for joint administration of

---

[1] Dkt. 125. Unless otherwise indicated, all references to docket entries are in Case No. 10-10379, the lead case in these jointly administered cases.

[2] Sale No. 6 also offered two additional tracts of real estate owned by debtor AFP, 590 Commerce Parkway and Lot 3 (vacant lot located between 500 and 590 Commerce Parkway) and personal property and equipment owned by debtor A-1. Sizewise offered $400,000 for 590 Commerce, $10,000 for Lot 3, and $503,000 for the personal property and equipment. *See* Dkt. 125.

[3] Dkt. 144.

[4] Debtors represent in pleadings that normal business operations ceased in October of 2009 and complete business operations ceased pre-petition in February 2010. *See* Dkt. 125, ¶ 3.

these cases was entered on March 25, 2010.⁵ Early in the cases, the debtors determined to offer the debtors' property for sale, first to a new entity made up of members of the Allenbaugh family (A-1 Scaffold Mfg., Inc.), then later to third-party buyers.⁶ Those sale motions were withdrawn and ultimately replaced by the current motion for Sale No. 6.⁷ Sunflower Bank holds a claim well in excess of $3.5 million that is secured by real estate, equipment, inventory, and other collateral.⁸ By all accounts, the Bank is significantly under-secured. As a result, it has strenuously resisted any sort of surcharge to its collateral. The following chronology is important to understanding the dispute over Weigand's fee.

Weigand agents first met with the Allenbaughs concerning acting as their broker in December of 2009. At that time, Weigand developed an opinion on the appropriate prices for the real estate and a marketing plan.⁹ Shortly after the debtors filed their chapter 11 cases in February, AFP filed a marketing agreement between AFP and Weigand, and an Exclusive Sales Commission Agreement dated February 19, 2010 for the 500 and 590 Commerce Parkway properties in Hays, Kansas.¹⁰ On March 24, 2010 AFP applied to the Court to appoint Weigand as a realtor under §

---

⁵ Dkt. 54.

⁶ Debtors filed separate sale motions for the personal property and real property and initially did not include all real property. *See* Dkt. 33 (Sale No. 1 – personal property), 35, 74, 95, Case No. 10-10379 (A-1); Dkt. 30 (Sale No. 2 - 590 Commerce Parkway), Case No. 10-10378 (AFP).

⁷ *See* Dkt. 100, 135.

⁸ The Bank's right to credit bid was limited to 500 Commerce Parkway as it did not have a mortgage on 590 Commerce or Lot 3.

⁹ Ex. 1

¹⁰ *See* Dkt. 23 and 24, Case No. 10-10378.

329.[11] The Court entered an interim order granting this application on March 25, 2010 and a final order on April 16, 2010.[12] Pursuant to the orders, the Court approved the Exclusive Sales Commission Agreement that provides for Weigand to receive a six percent commission on the gross sale price of the real estate.[13] The Agreement reads, in part, "Any sale or exchange of the Property which closes during the Listing Term shall entitle Broker to the compensation set out in paragraph 2 below."[14] The listing term was to end on August 15, 2010. Pursuant to this Agreement, Weigand and its cooperative agent Galen Romme, exposed the real estate to several prospective buyers including Sizewise, the eventual cash bidder.

Under the Agreement, Weigand proposed to market AFP's two tracts for the following prices: for 500 Commerce Parkway - $850,000 and for 590 Commerce Parkway - $550,000.[15] On March 16, AFP filed its Motion and Notice of Sale No. 2 wherein it proposed the sale of **590** Commerce property to the new Allenbaugh entity, A-1 Scaffold, for $400,000.[16] The Sale No. 2 motion met with several objections, including those of the Bank and Sizewise.[17] Sizewise issued a Letter of Intent dated March 22, 2010 to purchase the **500** Commerce property and personal

---

[11] *See* Dkt. 44, Case No. 10-10378

[12] Ex. 7 (Dkt. 49 and 68, Case No. 10-10378).

[13] Ex. 2.

[14] *Id.*

[15] *Id.*

[16] Ex. 3 (Dkt. 30, Case No. 10-10378).

[17] Dkt. 59 (Bank), Dkt. 60 (Sizewise), Case No. 10-10378.

property therein for $850,000, after having toured the properties on March 17.[18] On April 15, the Bank notified the debtors through counsel that it intended to bid $1.75 million for **500** Commerce.[19] The Bank styled this as a "credit bid" despite the fact that no notice of sale concerning **500** Commerce had issued as of that date. The Motion and Notice of Sale No. 2 was set for hearing on April 20, 2010 and on the date of the hearing, Sizewise submitted a proposed purchase contract wherein it offered a total of $1,703,000 for the 500 Commerce property ($800,000), the 590 Commerce property ($400,000) and personal property ($503,000).[20] Remember that Sale No. 2 offered only the 590 Commerce property, but Sizewise advised at the hearing that its offer was conditioned upon successfully acquiring the 500 Commerce property.

At the April 20 hearing, the debtors withdrew the sale notice and, at the strong suggestion of the Court, announced that a sale of <u>all</u> of the tracts would be re-noticed promptly.[21] On May 4, 2010, debtors issued Motion and Notice of Sale No. 6 proposing a sale to Sizewise of 500 Commerce, 590 Commerce, Lot 3, and personal property.[22] Sale No. 6 recognized the Bank's right to credit bid on 500 Commerce and the personal property and reservation of the issue concerning the realtor's commission.[23] Under the sale motion, the realtor's commission was to be calculated

---

[18] Ex. 4. At the May 26 hearing, Sizewise was revealed as the undisclosed purchaser in the Letter of Intent. Sizewise is engaged in manufacturing wheel chairs through its subsidiary Wheel Chairs of Kansas.

[19] Ex. 6.

[20] Ex. 8 (Dkt. 71, Case No. 10-10378).

[21] *See* Ex. 9 and Ex. 11.

[22] Ex. 10 (Dkt. 125).

[23] *Id.* at ¶s 16, 17.

-5-

upon the highest *cash* bid for the property.[24] Sizewise offered $800,000 for 500 Commerce. This part of the offer was conditioned upon it being the high bidder for 500 Commerce *and* the personal property and equipment located at 500 and 590 Commerce; Sizewise's offer for 590 Commerce and Lot 3 were no longer conditioned upon it being the successful bidder on the 500 Commerce and personal property.[25] Notwithstanding having received the Bank's April 15 "credit bid" on 500 Commerce, AFP did not mention it in Sale Notice 6. Thereafter, on May 10, the Bank officially credit bid $1.75 million for 500 Commerce by filing a pleading with the Court.[26] It also objected to the payment of a realtor's commission to Weigand if the Bank were the successful bidder. Sale No. 6 was set for hearing on May 26, 2010.

The evidence suggests that Weigand indeed procured Sizewise as a possible purchaser. Weigand and Romme each acted to expose Sizewise to 500 Commerce. A Sizewise official testified that 500 Commerce was the property the company really wanted to buy initially. The company was in an expansion mode and was seeking to double its existing manufacturing space. Sizewise became aware of the availability of the A-1 facility around March 10, after the bankruptcy filing, when contacted by Romme. Weigand agents met at Hays with the Sizewise principals on March 17 to tour and inspect the 500 and 590 Commerce facilities. This testimony is supported by Sizewise's March 22 Letter of Intent on 500 Commerce, prior to any motion and notice of sale being made by AFP in the bankruptcy proceedings with respect to 500 Commerce. Sizewise has done business with A-1

---

[24] *Id.* at ¶ 17.

[25] *Id.* at ¶ 15. At the May 26 hearing, however, the parties advised the Court that Sizewise's cash offer for 590 Commerce ($400,000) and Lot 3 were conditioned upon the closing of a sale and assignment by the Bank (as the high credit bid) to Sizewise on 500 Commerce and the personal property/equipment.

[26] Dkt. 144.

in the past and obtained parts for its wheelchair manufacturing business from the debtor A-1. Sizewise principals returned to Hays on or about April 15 for another view of the equipment and personal property in 500 and 590 Commerce to arrive at a purchase figure. Weigand also showed the property to another prospect during the March and April interval, again using its cooperating broker, Galen Romme.

At the May 26 hearing on Sale No. 6, the Court approved the Bank's credit bid, but reserved its ruling on the commission question. The parties sought to proffer evidence concerning the commission issue, but the Court requested and received oral testimony. The Court finds that the Bank at all times considered 500 Commerce to be worth more than its listed price of $850,000 and that it expressed its intention to credit bid in order to protect its position. Bank officer Chad Steffan made clear his view that the property had been under-priced and that it should not have been listed at this price. The Bank also credit bid $503,000 for the equipment. Steffan testified that the Bank was currently in negotiations with Sizewise to sell it 500 Commerce and all the equipment for $1.975 million. Sizewise submitted the high bid for 590 Commerce at $400,000 and Lot 3 and this bid was approved at the May 26 hearing.

Analysis

At issue here is whether Weigand should be paid a commission on the $800,000 Sizewise cash bid even though the Bank's credit bid took the sale. This implicates questions of Kansas and bankruptcy law. Kansas law holds that a real estate broker that (1) produces a buyer that is ready, willing and able to close; and (2) is the efficient and procuring cause of the transaction, is entitled to his commission. *Harrin v. Brown Realty Co., Inc.,* 226 Kan. 453, 456, 602 P.2d 79 (1979). Even when a transaction fails to close, the realtor may still be entitled to a commission if the failure of the

closing results from the actions or interference of the realtor's principal. *Id.* While it is the burden of a real estate agent to prove he is entitled to a commission, the parties to a commission agreement may contract for the payment of a commission in various circumstances. *Id.* at 456, 459-60; *Winkelman v. Allen*, 214 Kan. 22, 519 P.2d 1377 (1974). That happened in this case. The Commission Agreement specifies that Weigand will receive a commission on "any sale or exchange of the Property which closes."[27] The Court concludes that when it procured Sizewise, Weigand procured a ready, willing and able buyer who did not close on its $800,000 offer due to circumstances beyond its control: *i.e.*, the Bank's credit bid.

There is no question that the Bank was within its rights to credit-bid as much of its claim as it saw fit. 11 U.S.C. § 363(k) provides that at a sale under § 363(b), the holder of a lien in the property being sold may bid at the sale and, if it purchases the property, it may "offset such claim against the purchase price." In this case, the Bank's April 15 letter stands as notice to debtor that it intended to credit bid $1,750,000 on 500 Commerce when it was noticed for sale. Its bid notice filed May 10 is its credit bid to Sale 6.[28] Both "credit bids" were made after Sizewise's March 22 Letter of Intent and April 6 objection to Sale 2. There is no question that Weigand did not "procure" the Bank as a buyer – indeed, in a practical sense, the Bank "bought" this property years ago when it loaned AFP the money its mortgage secures. But the analysis does not end there. If credit-bidding by the senior lender defeated any compensation to the estate's realtor, there would rarely be an incentive for any realtor to participate in a bankruptcy sale that involved real estate encumbered by a lien.

---

[27] Ex. 2.

[28] Dkt. 144.

Case 10-10379    Doc# 188    Filed 06/07/10    Page 8 of 11

11 U.S.C. § 506(c) provides that the trustee, here, the debtor-in-possession, may recover from the property securing an allowed secured claim reasonable, necessary costs and expenses of preserving or disposing of such property "to the extent of any benefit to the holder of such claim...." Did the Bank secure a benefit? In this Court's judgment, the Bank benefitted from Weigand's marketing the property and procuring a prospective purchaser. The purchaser offered $800,000 – $50,000 less than the debtor's asking price. That the Bank's bid was more than twice that price does not negate the fact that Weigand and Romme procured a buyer. Weigand undertook the engagement and sought buyers without knowing the extent to which the Bank intended to expend its claim or that it was a certainty that the Bank would thwart any cash deal with a credit bid. Often lenders are only too happy to get cash.

Weigand's efforts to bring a purchaser to the table benefitted the Bank in another way. It enabled the Bank to leverage its credit bid to exact a higher purchase price from Sizewise, if Sizewise was intent on acquiring 500 Commerce. The Sizewise official testified that Sizewise was unaware of the Bank's interest and potential credit bid until the Bank sent the April 15 letter to debtors' counsel advising of its intent to credit bid. As is the case here, Sizewise's presence and the Bank's credit bid brought these parties together to further negotiate a price to sell the property from the Bank back to Sizewise. It was not until after the hearing on Sale No. 2 that the Bank and Sizewise began to deal directly with one another. And it was not until the day of the May 26 hearing on Sale No. 6 that the Bank and Sizewise reached an agreement in principal for the Bank to sell and assign 500 Commerce over to Sizewise, for compensation in addition to Sizewise's $800,000 cash bid. By negotiating a side-deal with Sizewise, the Bank avoids the costs and expenses to market the property itself and likely eliminates a lengthy period in which the Bank would be stuck holding the

property with the attendant risk that the Bank could not move the property at the price it projects. The Court concludes that the Bank indeed secured a benefit from Weigand's procuring Sizewise as a cash purchaser.

Several cases suggest that estate professionals cannot be denied compensation when a credit bid triumphs. *See generally*, John T. Gregg, *A Review of Credit Bidding under 11 U.S.C. § 363(k)*, NORTON ANN. SURV. BANKR. L., Part II § 3 (Aug. 2008). One court held that a credit bid is simply another method of payment that is an alternative to cash–had the lender bid cash, it would have recouped the cash at closing to satisfy its secured claim. As the investment banker's retention letter spoke in terms of a percentage fee based on "aggregate consideration," the court was comfortable in deeming the credit bid as part of that consideration. *See In re HNRC Dissolution Company*, 340 B.R. 818, 821 (E.D. Ky. 2006). Another court held that even where the secured creditor objected to the investment banker's retention and to any potential surcharge, the sale process established a market value for the assets sold which conferred a benefit on the creditor. Moreover, absent the ability to surcharge a credit bid, professionals would be discouraged from providing services to debtors or trustees if their fees could be circumvented by credit bidding. *See Borrego Springs Bank, N.A. v. Skuna River Lumber, L.L.C. (In re Skuna River Lumber LLC)*, 381 B.R. 211, 213, *rev'd on other grounds*, 514 F.3d 353 (5th Cir. 2009). The Fifth Circuit reversed because, prior to awarding the surcharge, the bankruptcy court approved the sale and allowed it to close. The Fifth Circuit held that with the transfer of the assets out of the estate, the bankruptcy court lost jurisdiction of them. Finally, another court allowed institutional lenders the right to credit bid but if the successful bidder, would be required to pay a ten percent buyer's premium. The bankruptcy court noted that the buyer's premium was "in lieu of the costs a lender would incur to foreclose, market, and sell the

Case 10-10379    Doc# 188    Filed 06/07/10    Page 10 of 11

property." *See In re NJ Affordable Homes Corp.,* 2006 WL 2128624 at *16 (Bankr. D. N.J. 2006).

In any event, Weigand's activity in this case assisted in the disposition of the debtors' real estate and its ability to be compensated by a commission on the amount of actual cash bid for 500 Commerce should not be thwarted by the Bank's credit bid. By marketing the property and supplying a cash bidder, Weigand aided in the disposition of the property. The Court is unimpressed with the Bank's complaint that Weigand under-priced the property because the Bank had an opportunity to object to Weigand's retention and, by implication, the listing price. AFP filed the Commission Agreement with its application to employ Weigand and the prices were specified in the Agreement. The Bank was silent. Moreover, Weigand's pricing appears to be based on other comparable listings and sales. The Bank's attributing more than twice the asking price to this land is more a function of its desire to control the asset than it is evidence of the observed market for like comparable property.

The Court therefore concludes that Weigand is entitled to a six percent commission on the $800,000 cash bid of Sizewise, or $48,000. A surcharge in that amount pursuant to § 506(c) shall be assessed against the 500 Commerce property prior to its conveyance by the estate to the Bank and the Bank shall fund that amount in cash for payment to Weigand in accordance with its listing agreement.

IT IS SO ORDERED.

# # #

-11-

Case 10-10379    Doc# 188    Filed 06/07/10    Page 11 of 11